Opinion of the court delivered by
Whyte J.
The hill
states, that on the 6th August 1807, Jacob Garrison entered 640 acres of land, (entry No. 48, on -warrant No. 4179;) that on the 14th day of the same month, in the same office, John Curtis entered 200 acres within the hounds of the said 640 acres, and a grant issued on this 200 acres to said Curtis; and Curtis conveyed this 200 acres to Jacob Harder and his heirs. That said Garrison for a valuable consideration, executed his bond, and therein covenanted to convey the 640 acres (No. 48,) to Harder.
*4 That complainant, Thomas Shute, in the name of Rob-Thompson, entered 340 acres within the bounds of entry No. 48, that a caveat was filed to prevent Harder from obtaining a grant either in his own name, or Garrison’s, or any other. That it was decided on the caveat, that the entry of Garrison was entitled to the grant, in preference to the entry of Thompson, and costs of caveat to be paid by Thompson; and that thereby, the said Harder will obtain a grant on entry No. 48, unless prevented by injunction.
That the said Harder was entitled to the 200 acres of Curtis, and the 640 acres of Garrison by virtue of the said covenant to convey to him as aforesaid.
That qpe Reuben Huggins, recovered a judgment against the said Jacob Harder, at the January term 1814 of the Williamson county court, for $>112 12-100 and $>19 6-100 costs, that a fieri facias issued on said judgment, which was levied on said 640 acres (entry No. 48,) and said 640 acres was sold as Harder’s property, by virtue of said levy, on the 5th March 1814, to Asa Shute. That Asa Shute has since then died intestate, and complainant Thomas is one of his heirs.
To this bill there is a demurrer, and the question presented for the opinion of this court is, whether the interest of Harder in entry No. 48, is subject to sale by execution.
Harder’s interest in said entry, is a bond to him from Garrison (the enterer,) by which he, Garrison, covenants to convey said entry, No. 48, to the said Harder. Now what notice does a court oí law take of this transaction? —What right does it create in Harder if' the land is not conveyed by the time stipulated? What is his remedy for this breach at law? The law gires a right to damages, and the action of covenant to ascertain and recover them, but nothing else; his right is purely personal, and does not attach on the land. A court of law therefore can give no judgment that can affect it directly in terms, as a court of equity might; nor can it be done indirectly by an execution; for the law only notices legal interests and *5 such only can be taken in execution at common law, and I shall presently notice the alterations produced by statute.
So far the law would go in this case upon a breach, but the equity jurisdiction goes further; it looks at the substance of the transaction between the parties. It sees that the object of the contract between the parties, was on the one hand to transfer, and on the other to acquire this land; that the bond or covenant was only secondary or auxiliary thereto, as evidencing the contract, and tending to enforce a compliance by the obligor. . If such a case appears before it, after a proper investigation of the facts, it has the power, and accordingly exercises it by its decree of carrying the contract into execution, and vesting the legal title to the land in the covenantee.
But this is not the province of a court of law, and its execution is circumscribed by its jurisdiction. Thus Lord Coke in his first Institute, page 289 b. says, “Ea quce in curia nostra rite acta sunt, debites esecuiione demandan de-bent.” This maxim of the common law concerning executions points out the object of them, and limits the subjects that may he demanded by them: these are legal rights, such as are usually acted upon in courts of law. The present subject of execution, however, and others of a like nature are not rite acta, but so much the reverse, as Mr. Butler (in his learned note on Co. Litt. 290 b„) says, that the courts of law profess in most cases a legal ignorance even of their existence; still they form a considerable part of the jurisprudence of the country.
As this interest is not the subject of execution by the common law, it remains to he considered whether it is made so by statute, that is, by actof Assembly, or by English statute. Is it within the 29 Charles 2, ch. 3, see. 10 ? And is the 5th Geo. 2, which extends the provisions of the statute of Ch. 2, to the plantations, in force here? As this was controverted at the bar, the grounds will he noticed upon which it is believed the statute of George is in force here.
By the constitution of this State, (article 10, sec. 2,) “all *6 laws and ordinances, now in force and use in this territo- ^ no£ inconsistent with this constitution, shall continue to be in force and use in this State, until they shall expire, he altered, or repealed by the Legislature.” This shows what laws should be in force and use in this State by the adoption of the constitution, to wit, the same that were in force and use before, when a territory; what these were is pointed out by the cession act of 1789, ch. 3, condition 8, “that the laws in force and use in the State of North Corolina, at the time of the passing of this act, shall be, and continue in full force within the territory hereby ceded, until the same shall be repealed, or otherwise altered, by the Legislative authority of said territory.” This brings us to the laws of North Carolina, which were in force and use there at the time the cession act was passed, as the standard whereby to ascertain the present laws of this State, subject to the exceptions specified.
By an act of the Legislature of North Carolina, passed in the year 1778 (ch. 5, sec. 2,) for the purpose of removing the doubts, if any should arise, as to what laws should be in force there upon the revolution of the government which had taken place, it is enacted, “that all statutes, and such parts of the common law as were heretofore in force and use within the territory, and all the acts of the late General Assembly thereof, or so much of the said statutes, common law, and acts of Assembly, as are not destructive of, repugnant to, or inconsistent with the freedom and independence of this State, and the form of government therein established, and which have not been otherwise provided for, in the whole or in part, not abrogated, repealed, expired or become obsolete, are hereby declared tobe in full force within this State.”
Under this act of Assembly the question arises, what English statutes were enforced by it in the State of North Carolina? or to be more particular, was the 5th Geo. 2, ch. 7, sec. 4, enforced by it, or continued thereafter if in force before? That statute is in the following words, “and be it further enacted by the authority aforesaid, that from and after the said 29th September, 1.732, the houses, *7 lands, negroes and other hereditaments and estates, situate or being within any of the said plantations, belonging to any person indebted, shall be liable to, and chargeable with all just debts, duties and demands of what nature and kind soever, owing by any such person to his Majesty, or any of his subjects; and shall and may be assets for the satisfaction thereof, in like manner as real estates are, by the laws oi England, liable to the satisfaction of debts due by bond or other specialty; and shall be subject to the like remedies, proceedings and process, in any court of law or equity in any of the said plantations respectively, for seising, extending, selling or disposing of any such houses, lands, negroes and other hereditaments and real estates towards the satisfaction of such debts, duties and demands, in like manner as personal estates in any of the said plantations respectively, are. seised, extended, sold or disposed of for the satisfaction of debts.
It was considered in the case of Russell vs. Stinson in this court at Rogersville (November term 1816,) that this statute of 5th Geo. 2 was in force in North Carolina after the year 1732, and was in use and acted under after that time in that State; — that the alteration in the fieri facias from goods and chattels, to goods and chattels, lands and tenements, owes its origin to this statute, and that the authority for its introduction rests solely upon it; —that this is recognized by the act of 1777, chap. 2, sec. 29, which speaks of the fieri facias, as a process that had heretofore issued in that manner, and is so continued under the new order of things &c. And as a further evidence of this statute being in force and use, it was there observed, that no instance was known of lands devised, being protected against the claim of the testator’s creditors, in which the heir was bound, from the year 1732 to the year 1789, when the 3d and 4th of William & Mary ch. 14, was re-enacted, (1789 ch. 39, sec. 2,) -which protection, if it had existed, could only have proceeded from the non-adoption of the statute of 5th Geo.2, by the, then, province of North Carolina.
Considering this statute, then, as in force and use, lands *8 and other real estate in the plantations by it were made jj^ig^as rea¡ estates by the law of England are liable to the satisfaction of debts due by bond or other specialty, and subject to the like process for seising, selling, &c. as personal estates are respectively in the said plantations»
The next thing is, what estates are liable in England to the satisfaction of debts by execution.
We have already seen what were liable by the common law. The statute 29, Ch. 2, ch. 3, sec. 10, in addition, makes trust estates liable; that section is in the following words: “That it shall be lawful for any Sheriff or other officer, to whom any writ or precept is directed, at the suit of any person of, for, and upon any judgment, statute or recognizance, to do, make and deliver execution unto the party in that behalf suing, of all such lands, tenements, rectories, tithes, rents and hereditaments, as any other person or persons, are in any manner or wise sei-sed or possessed in trust for him against whom execution is so sued, like as the Sheriff or other officer might or ought to have done, if the said party against whom execution was sued had been seised of such lands &c. of such estate, as they aré seised of, in trust for him at the time of the said execution sued, which lands &c. by virtue and force of such execution, shall accordingly he held and enjoyed, freed and discharged from all incum-brances of such person or persons as shall he so seised or possessed in trust for the person against whom such execution shall he sued; and if any cestui que trust shall die, leaving a trust in fee simple to' descend to his heir, then and in every süch case, such trust shall be deemed and taken, and is hereby declared to be assets by descent, and the heir shall be liable to and chargeable with the obligation of his ancestor, for and by reason of such assets, as fully and amply as he might or ought to have been, if the estate in law had descended to him in possession in like manner as the trust descended.”
Such is the statute of Charles; — now is the interest that was seised and sold under this execution of Huggins *9 vs. Harder, such an interest as could have heen seised and extended in England under this statute.
The statute 29th Ch. 2, ch 3, s. 10, requires a seisin in trust, by the trustee for him against whom the execution issues, at the time it issued. As if a feoffment is made to A. and his heirs, to the use of B. and his heirs, to the use of C. and his heirs, the statute 27th Henry 8, executes the estate in B. and the legal interest passes to B.; but it does not execute the use in C. yet C. is the person intended to be benefited, and this limitation to C. is a trust which chancery will execute, and this is a trust which under the statute 29th Ch. 2, is seisable and extendible by execution; for there is a seisin by the trustee B. upon a conveyance made to A. — So if A. bargains and sells lands to B. and his heirs for the use of C. and his heirs, this limitation to C. and his heirs isa trust which chancery will execute. (Saunders on uses and trusts 315.) And this trust is extendible under the statute of Charles, for there is a seisin in B. for the cestui que trust C.
So if A. takes a conveyance in the name of B. and his heirs for land, the purchase money of which he has paid, this trust is extendible under the statute of Charles, for B. is a trustee, and he is seised by the conveyance for A. the cestui que trust. So if the owner of an estate make a voluntary conveyance of it, and make a declaration of trust as to one part of the estate, and is silent as to the other part, as to the part of which no declaration of the trust is made, the trust thereof results to him who made the conveyance, and the legal owner is a trustee for so much.
In all these cases, there is a seisin in the trustee for the cestui que trust, and an execution against him will attach upon the trust estate, operating upon the seisin of the trustee by force of the statute &c. (2 Blk. Com. 337.)
Had Harder this seisin by virtue of the bond? The bond contained a covenant or obligation to convey at some future time; does this create a seisin in the obligee? If it does, then a bond to convey operates as a convey- *10 anee; but all the books show the reverse of this, and the c]¡s|jnc(|on js wcjj established, between a covenant to convey and a conveyance. Thus it has been held that arti-cíes entered into before marriage to settle lands to certain uses, do not raise any uses, until a conveyance is made to create those uses, according to the articles, as in the case oí Edwards vs. Freeman, (2 P. Wms. 435;) there Freeman upon his marriage with his first wife, covenanted with his father-in-law, that he would settle all his lands to certain uses; the marriage took effect, there was issue, and his wife died. He afterwards married a second wife, and settled upon her and her issue the greater part of the lands comprised in the articles, which were by said articles to have been settled on the first marriage. It was held that such settlement was good, and must take place against the articles, and that no mere lands were liable to the articles, than were omitted out of the settlement on the second marriage. Now this case shews that the articles or covenant, did not operate upon the seisin of the covenantor, as a conveyance would have done, or the statute would have executed them, in which case nothing would have been left for the settlement to operate upon, and of course the settlement would have been inefficient. To the same point is Trevor vs. Trevor, (1 P. Wms. 622,) and Andrew Bainstone’s case (Dyer 96a.) (Saunders on uses 119;) there T. S. by indenture covenanted and granted, in consideration that A. B. had conveyed divers lands and tenements to him in fee simple, after the death of the said A. B. that he the said T. S. would levy a fine of other lands whereof he stood seised, to the said T. S. for life, remainder to the said A. B. in tail. There was no fine levied, and it was held that this covenant to levy a fine, did not change or raise any use, so as to cause it to be executed by the statute. Here, says Mr. Saunders, we see only a covenant to make a conveyance, which covenant was not like a covenant to stand seised, or indeed like any other conveyance, for it was nothing more than a covenant to make a conveyance out of which uses would arise, and until iliaÍ conveyance was made, the uses remained ■i? ihey were hefiuc..
*11 I have slated Ihis ease of Bainstone’s at length, for it establishes m the most clear and unequivocal manner, the distinction above alluded to between a covenant to convey, and a conveyance — and that uses are .not raised so as to be executed by the statute but by a conveyance, for there must be a seisin to serve them, which articles or a covenant do not give.
Now what uses were before the statute of 27 Henry 8, trusts are since; both are executory and to be executed by chancery. Uses before the statute were of two kinds, raised; — -or, articled or covenanted to be raised; we have seen what an use raised is, such a use as would be executed by the statute, there being a seisin to serve it upon a proper conveyance. So since the statute and the introduction of trusts, the same difference prevails as to them; they are either raised, or covenanted tobe raised, yet still both are executory, for a trust executed is a legal estate. Therefore, in their very nature, though raised, trusts are executory, and so says Lord Hardwickc in Bagshaw vs. Spencer. A trust raised, then resembles an use raised before the statute, that is upon a conveyance with a seisin in the trustee to serve it. A trust articled to be raised, though still a trust, and one which chancery will execute, is without a conveyance and seisin to support it; as money articled or devised to be laid out in land, which when purchased should be settled to certain, and upon particular trusts; now until the lands are purchased, neither the uses nor trusts can be raised, but still they are trusts executory, and the cestui que trust shall compel the trustee to purchase the lands. (Saunders on uses 122.)
Guided by these authorities, I cannot say that any other trust is extendible under the statute 29, Ch. 2, ch. 3, sec. 10, but a trust that is raised by, or upon a proper conveyance ; that a trust articled or covenanted to be raised, is not such a trust, for it depends upon a further act tobe done by the' party, it wants that seisin which the statute requires, and which until it is had by a proper conveyance, rests only in contract, or on covenant.
*12 Equally out of the statute must be all those trusts, that - . , , , „,. , , ■, are so denominated on account of the remedy to be anor-ded to the party injured: and indeed to me it would seem a most extraordinary position, to hold, that a constructive trust should be within that statute, such an one as may or may not according to circumstances be established by a court of equity. Trusts of this nature depend upon controverted facts, and according to the prevalence of these facts, on the one side or the other, the decree is moulded. The present is one of that kind; the bond from Garrison to Harder exhibits a contract or covenant to convey at some future time, a certain specified tract of land; upon examination, however, this contract may be moulded differently, or it may be entirely cut down by fraud, or it may be shown to be satisfied, or it may be released. These all depend upon the pleadings and evidence, and according to their establishment or the reverse, is Garrison to be declared a trustee by a court of equity, and the contract or trust to be executed by it.
Such a possible, eventual trust as this, could never be the trust meant by the statute. The subject of an execution ought to be certain, that men may know what it is they buy, and what they ought to give for it, that the judgment may fix the fair marketable equivalent, and not blind chance govern the sale, which unquestionably must be the case, if such interests or contracts as the present, were saleable under execution. Sales of interests of this nature would be productive of both public and private injury: the encouragement given by them to this species of hazard would be impolitic, which if successful for the bidder,at best would have an unfortunate effect upon his morals, and also upon those of others, followed up as it would be by shifts in evasion of the sale, by law suits and perjury. Upon the debtor it would be ruinous; — an interest worth ‡1000 or $¡10,000, might be, and from the uncertainty in which it is involved, probably would be sold for a very trifling sum, notwithstanding every honest disclosure of the value and circumstances by such debt- or, to enhance the value for the benefit of himself and his *13 creditors. His creditors would lose their debts, as by this means a fund sufficient to pay all the debts is swept away from them without value, and without redress.
How very different from this is a trust raised by a conveyance ; it is as certain as to its nature and existence, as a legal estate, and its value can easily he ascertained. It depends not upon controverted facts, and the testimony of witnesses, for either the one or the other; the records of the country which are accessible to all men, give it notoriety, and the evidence by which it is created, (the conveyance) imposes on it the stamp of value, not to be obliterated by the interested doubts and surmises of adventurers.
It only remains for me to say, that not knowing any decision or practice in North Carolina, or this State authorizing a greater latitude to the statute of Charles, than that here mentioned, to wit: a direct trust upon a conveyance, and a resulting trustupon a conveyance,or,as authorizing any other equitable interest to be subjecled to execution by virtue of the expression “real estates” used in the 5th Geo. 2, — in the act of 1784 ch. II, and in the act of 1786, ch. 14. I consider the matter settled and at rest; the demurrer must therefore be sustained and the bill dismissed. Bill dismissed.